GEORGE P. CRONK, APPELLEE, v. CORA L. CRONK,
APPELLANT.

FILED NOVEMBER 27, 1912.     No. 17,024.

Divorce: EXTREME CRUELTY. Decree granting a husband a divorce on
the ground of extreme cruelty affirmed as a proper disposition of
the case under the evidence.

APPEAL from the district court for Douglas county:
ALEXANDER C. TROUP, JUDGE. *Affirmed.*

*W. W. Slabaugh* and *G. W. Shields,* for appellant.

*Crane & Boucher* and *A. W. Jefferis,* contra.

ROSE, J.

The parties are husband and wife. The husband is
plaintiff, and the trial court granted him a divorce on the
ground of extreme cruelty. The wife appeals, and insists
that under the evidence the divorce should not have been
granted.

They were married September 18, 1906, and the suit
was commenced June 20, 1910. The intervening time was
full of sensation and scandal. Both had been previously
married and divorced. They lived in Omaha. Evidence
relating to what occurred after they became husband and
wife fairly establishes the following facts: Defendant
accused her husband of marital infidelity, and at the trial
was unable to prove her charges, though she had previ-
ously given them wide publicity. She clandestinely took
his watch and other articles of personal property and
pawned them to secure money for herself. She accepted
from her husband money and transportation for a trip to
Virginia to visit her relatives, and consented to his going
to California at the same time to visit his children by a
former wife. After he left Omaha pursuant to this under-
standing, she secretly followed him and spied upon him

while he was visiting with his children at Long Beach. She falsely intimated to police officers there and at Los Angeles that her husband was having improper relations with his former wife and importuned them to arrest him. In California she deliberately gave newspaper publicity to her simulated wrongs, and made him and his children the subjects of sensational notoriety and scandal. In Omaha she went before the grand jury, falsely charged him with wife-desertion and nonsupport, and attempted to have him arrested. She directed public attention to her scandalous relations with her husband by hurrying after him in the public streets of Omaha, by calling to him, and by giving publicity to her unfounded suspicions. She went personally to eminent citizens who were fraternal brethren of her husband and falsely accused him of desertion and nonsupport, with a view to having him investigated by his lodge and disgraced. She was wholly unable to disprove this conduct. In some form it was often repeated. It was deliberately planned and appeared to get worse. There is convincing proof that it robbed her husband of his peace of mind, made his marital relations intolerable, and seriously impaired his health. It amounted to extreme cruelty within the meaning of the divorce laws. His conduct is assailed by his wife, but the proofs do not justify a finding that he was guilty of such misconduct as would warrant a court of equity in dismissing his suit on that ground.

Defendant offered a vast amount of testimony to establish condonation. If full credence could be given to the witnesses who testified in favor of defendant on that issue, the defense might be established, but the trial court, under all the circumstances, properly disbelieved their testimony on material matters. After the alleged condonation, defendant's conduct was more cruel than before. A careful consideration of the entire record leads to the conclusion that the findings below were right and that the divorce was properly granted. An analysis of the evidence would not benefit the parties nor improve the litera-

ture of the court. It has all been carefully examined, however, and the decree below is adopted as correct.

AFFIRMED.

REESE, C. J., dissenting.

Having read the abstract containing the proceedings upon the supplemental hearing, I am compelled to dissent from the opinion of the majority in this case. After the submission of the case to the district court, quite a lengthy memorandum opinion was written and filed by the judge who heard and decided the case. A portion of that opinion impresses me most strongly. After discussing another feature of the case, the court says: "But apart from this, what seems to be improbable in plaintiff's testimony is that these persons should be together even as much as plaintiff admits they were, and under the circumstances they were, and yet at no time were familiarities of any nature indulged in, or even suggested, as plaintiff testifies. Knowing these parties as I do and have come to know them since this litigation commenced, particularly the defendant, and knowing as I do that her persistent and almost unceasing effort and object has been to reinstall herself in her husband's favor, whether for good or evil, I need not now say, I can scarcely conceive it possible for these two persons to have been together for even as much as nine nights from 7 or 7:30 to 10 or 11 o'clock, according to plaintiff's testimony, or much later, according to defendant's testimony, in a room alone, and yet neither, at any time, having made any advances of familiarity to the other; that at no time throughout the entire series of visits did anything occur between them but what might be expected to occur between two strangers. Such a thing, of course, was possible, but, in the very nature of things, it seems to me it would not be probable."

There are many things stated in the opinion which reflect strongly upon the conduct and character of defendant, and which are probably merited, but for the purpose

Cronk v. Cronk.

of this dissent need not be set out.  The question sub-
mitted upon this supplemental hearing was whether there
had been a condonation after the rendition of the decree
of divorce in favor of plaintiff, the husband.  It is alleged
by defendant that after the decree was rendered, and
while the cause was pending in the supreme court on
appeal, the parties became reconciled, lived and cohabited
together as husband and wife.  There was a mass of evi-
dence introduced, aside from the direct and positive tes-
timony of defendant, which tended to establish that fact.
The testimony of plaintiff, in denial of the statements of
defendant and her witnesses, is equally strong and em-
phatic, and yet he shows by his own statements that he
was often in the room of defendant of evenings, but seeks
to explain his presence there by testifying that those visits
were at the solicitation of defendant for the purpose of
advising her upon matters of her business upon which she
was considering, and, in part at least, in which she was
engaging.  The consideration of this mass of evidence,
the knowledge of both parties as gained by the same judge
upon the hearing of the trial of the principal case, no
doubt prompted the remarks by the court above quoted.
It was but the measurement of both parties, applied after
their vile lives had been uncovered and laid bare to the
court, and which forced the judicial mind to the an-
nouncement made.

It is shown that this is the third matrimonial venture
by plaintiff and the second by defendant, each made pos-
sible by the divorce route, now much traveled to the dis-
grace of the American people.  Near the close of the opin-
ion the district court makes use of the following language:
"Again, speaking for the state as a party to these proceed-
ings, so much of crimination and recrimination already
has been indulged in between these parties that I am satis-
fied no good could possibly result from any attempt at
reunion.  Better, far better, and now more than ever, both
for themselves and the public, that these persons be
divorced and this tiresome and unprofitable litigation

end." To this doctrine I cannot agree. The legitimate conclusion to be drawn, though not so intended by the court, must be that, since the parties have so far graduated in sin and uncleanness and by their "crimination and recrimination" have laid open to the public gaze the immorality of the life of each, and that owing to that fact "no good could possibly result from any attempt at reunion," therefore it would be "better, far better, and now more than ever, both for themselves and the public," that they be divorced, and "this tiresome and unprofitable litigation end." Judging the future by the past in the lives of these two people, I fear the decree would not have that salutary effect. On the contrary, each would thereby be turned loose upon society with the legal right to embark in new matrimonial schemes with other parties, much to the enjoyment, doubtless, of these litigants, but to the disgrace of the state and the crushing of the hopes and hearts of others.

The divorce laws were never intended for such abuses. Since divorces have been granted, in the earliest days, they have only been intended for· the protection of the innocent, but never as a reward for wrongs and crimes committed. Where each party is guilty of such conduct as might be grounds for divorce for one, had the applicant been innocent, it was never intended that the sacred bond of marriage should be severed because both were guilty. It does not follow that, because a reunion is rendered improbable by reason of the iniquities of both parties, a divorce should be granted in order that they may form "unions" with others, and in and by which the disgraceful courses of life may be further pursued in fresher and greener fields. This is the teaching of the whole theory of the divorce laws of this country. To my mind it is clear as the noonday sun that this divorce should not be granted to either party. Neither is entitled to it, and neither should receive it. If they do not desire to be reunited, they can remain separate, but should never be permitted to contaminate other lives under the guise of "holy matri-

mony." For these reasons, the whole proceeding should be dismissed, and the merited and unqualified condemnation of the court placed upon it.

FAWCETT, J., concurs in the dissent.